784 P.2d 730

**STATE of Arizona, Appellee,**

v.

**Danny Arthur MORAN, Appellant.**

No. 1 CA–CR 88–182.

Court of Appeals of Arizona, Division 1, Department D.

Dec. 28, 1989.

Robert K. Corbin, Atty. Gen. by Jessica G. Funkhouser, Chief Counsel, Criminal Div., and Robert S. Golden, Asst. Atty. Gen., Phoenix, for appellee.

Dean W. Trebesch, Maricopa County Public Defender by Edward F. McGee, Deputy Public Defender, Phoenix, for appellant.

FIDEL, Judge.

A computer programmer declined to follow his employer's directive to decode a program he had prepared in an encoded state. He was convicted of criminal damage. We reverse.

We find that defendant did not criminally damage his employer's program by encoding it because he did so with his employer's permission. We hold that one does not criminally damage the property of another under Arizona law when one acts with the

permission of its owner. We also find that defendant did not criminally damage his employer's program by refusing to decode it. Defendant's refusal to decode was an omission, not an act, and we hold that criminal damage is defined in Arizona as a crime of commission, not omission.

## FACTS

As program manager for ITT Courier Terminal Systems (ITT), defendant Danny Arthur Moran undertook to develop a computer program relating to depreciation of company assets. Defendant routinely encoded his programs, as was customary at ITT. Defendant's supervisor testified that a senior programmer would be expected, though not required, to do so.

When defendant requested a period of personal leave, his supervisor asked him to disclose his code so that others could advance the depreciation program in his absence. Defendant refused. ITT's personnel manager then ordered disclosure, and defendant again refused. This led to his suspension, after which another employee spent approximately ten hours of company time to decode defendant's work. Such was the evidence charged as defendant's crime.

Defendant was tried before the court without a jury on charges of computer fraud, a class 6 felony,[1] and criminal damage, a class 2 misdemeanor. At the close of the state's evidence, the trial judge granted defendant's motion for judgment of acquittal on the computer fraud charge, but denied it on the criminal damage charge. Later, at the close of all evidence, the trial judge found defendant guilty of criminal damage. Defendant was sentenced to serve four months in jail[2] and ordered to pay a fine of $437, which the judge designated as restitution.

Defendant argues on appeal that the trial court erred in denying his motion for judgment of acquittal on the charge of

criminal damage. We agree and direct that defendant be acquitted upon remand.

## DISCUSSION

### A. *An Act of Criminal Damage Must Be Unauthorized*

The Arizona legislature has expressly designated computer program damage as a crime. A.R.S. § 13–2316(B) (1978) provides:

> A person commits computer fraud in the second degree [a class 6 felony] by intentionally *and without authorization* accessing, altering, damaging or destroying any computer, computer system or computer network or any computer software, program or data contained in such computer, computer system or computer network.

(Emphasis added.)

Defendant was tried and acquitted under this statute. Because defendant was authorized to encode his program, the trial court found that his acts did not amount to unauthorized alteration or impairment. The court stated:

> The statute is very clear.... It just says "without authorization accesses or alters." He had authorization to access that program, and ... if the adding of an encrypting word is altering, he also had permission to alter by ... doing whatever was necessary to encrypt that program.

The court added that A.R.S. § 13–2316 does not criminalize the refusal to "unalter" or decode what one has permissively altered or encoded.

Thus, the defendant was acquitted under the statute that expressly addresses computer-related crime. Yet he was convicted of the more general charge of criminal damage. And, curiously, the trial court defined his criminal act as the very encoding that the court had earlier found authorized.

---

**1.** In return for defendant's stipulation to waive trial by jury, the state agreed that the computer fraud charge would be designated a class 1 misdemeanor.

**2.** The present sentence was ordered to run concurrently with a sentence that had been previously imposed for the unrelated crime of custodial interference.

The statute under which defendant was convicted, A.R.S. § 13–1602 (1982), provides in pertinent part:

A. A person commits criminal damage by recklessly:

. . . .

2. Tampering with property of another person so as substantially to impair its function or value.

Arizona law defines "tamper" as "any act of interference." A.R.S. § 13–1601(4) (1978).

The trial court explained defendant's conviction as follows:

*I find that you interfered, and that interference was the encoding of the program, that is, depriving the owner of that program of access to it.* That was the tampering. It was with the property of another; that is the data base of ITT. It was someone else's property that you interfered with.

The 'substantial' nature of the element is that it substantially impaired its function, that *in essence by encoding it you completely deprived them of the use* of that function, *of the data base.* $400 was required to repair or bring back to use the data base, so it was a $400 value, detriment to the victim of $400. So I find $400 would be a substantial impairing of its function or value.

So therefore, ... I find you guilty of Count II, criminal damage, a Class 2 misdemeanor.

(Emphasis added.)

■ We conclude that the trial court erred. Defendant committed no crime by encoding a program with the permission of its owner.

■ We note that Arizona separately defines aggravated criminal damage in A.R.S. § 13–1604(A) (1981) and common criminal damage in A.R.S. § 13–1602(A). The defendant was convicted of the lesser crime. To violate the aggravated criminal damage statute, one must act "without the express permission of the owner." A.R.S. § 13–1604(A). No such language is included in § 13–1602(A). We do not believe, however, that the omission of this phrase from the common criminal damage statute renders permission irrelevant to the lesser crime. Criminal damage is an act of tampering or interference, and one simply does not tamper or interfere with property when one acts with the permission of its owner. We conclude that the absence of the property owner's permission, though unstated, is a necessary and implicit element of the crime.

**B. *Criminal Damage Is Not A Crime of Omission***

■ We turn to the question whether defendant committed criminal damage by refusing to *decode* the program he was authorized to encode. This conduct was in the nature of an omission rather than a commission. *See, e.g.,* Kleinig, *Criminal Liability For Failures To Act,* 49 Law & Contemp. Probs., No. 3, 161 (1986) (hereinafter "Kleinig"). The evidence supports the conclusion that the omission was deliberate; defendant voluntarily refrained from an act that he was able to perform and that his employer reasonably expected him to perform. *Id.* at 165.

The question arises whether such an omission constituted interference for the purpose of Arizona's criminal damage statute. "Interference" is ordinarily used in law to connote actions rather than omissions. *See City of Charleston v. Mitchell,* 239 S.C. 376, 394, 123 S.E.2d 512, 520–21 (1961): "[T]he term 'interfere' has been said to import action, not mere inaction, an active rather than a passive condition...." *Id.* (citing 47 C.J.S. at page 83). *See also State v. Donaldson,* 84 Me. 55, 57–58, 24 A. 528 (1891). Used in its broadest sense, however, we conceive that interference can *result* from an omission. In this case, for example, it would suit common usage to say that, by refusing to decode, defendant interfered with or obstructed ITT's use of the program he had earlier encoded.

■ The criminal damage statute, however, does not use "interference" in its broadest sense. First, A.R.S. § 13–1602 does not define criminal damage as "interference," but as "tampering," a word with

only active connotations.[3] "Interference" serves in § 13–1601 as a definitional reference for "tampering," and we think it fair to conclude that "tampering" draws for definitional purposes only on compatible active connotations of the word.

Second, if there were doubt on this point, it would be relieved by the precise definitional language of the statute. A.R.S. § 13–1601 does not precisely define "tamper" as "interference," but as "any *act* of interference." The criminal code defines "act" and "omission" contradistinctively. § 13–105(1) and (21).[4] Thus, omissive interference is excluded from the ambit of criminal damage by the statutory requirement of an interfering act.[5]

We are confident that the legislature did not intend the implications of a contrary reading. Though there are categories of criminal omission in the Arizona code,[6] they are relatively few in comparison with the categories of criminal acts. One writer explains:

> [The] reluctance to penalise omissions is justified by the fact that to prohibit an act (by making its commission a crime or civil wrong) leaves the subject free to do many alternative acts; to prohibit an omission (by requiring the act to be performed) leaves him free to do only *one* act, the act which he is forbidden to omit; and this is a more severe burden to place on the citizen than if he is merely forbidden to perform an act.

Fitzgerald, *Acting and Refraining*, 27 Analysis 133, 139 (1967) (emphasis in original). *See also* L. Katz, *Bad Acts and Guilty Minds*, 135–53 (1987).

This reluctance to criminalize even blameworthy omissions is particularly appreciable in the employment context of this case. Defendant was insubordinate; he declined to perform a duty that arose from his employment with ITT. Such behavior is no stranger to the workplace. *See* H. Melville, *Bartleby, The Scrivener, Great Short Works of, Herman Melville* (1966). Often it interferes with the employer's efficient use of facilities and equipment. Yet

3. The Random House unabridged dictionary defines "tamper" as follows: "1. to meddle, esp. for the purpose of altering, damaging, or misusing.... 2. to make changes in something, esp. in order to falsify.... 3. to engage secretly or improperly in something. 4. to engage in underhand or corrupt dealings, esp. in order to influence improperly...." The Random House Dictionary of the English Language, unabridged (2nd ed. 1987).

4. A.R.S. § 13–105(1) provides: "'Act' means a bodily movement." A.R.S. § 13–105(21) provides: "'Omission' means the failure to perform an act as to which a duty of performance is imposed by law."

5. As Kleinig points out, to categorize conduct as an omission is not to categorize it as a non-event. "There is an attribution element to omissions that other nondoings do not possess." Kleinig, *supra*, at 169. We have acknowledged this attributive element of defendant's refusal. In stating above that "defendant voluntarily refrained from an act that he was able to perform and that his employer reasonably expected him to perform," we distinguish defendant's conduct from a mere "nondoing." This is not to say, however, that it constitutes an act, as A.R.S. § 13–105(1) defines that term ("bodily movement").

Kleinig argues (without reference to our statute) that omissions should be recognized for philosophical purposes as a kind of act. Kleinig, *supra*, at 171–74. He differentiates between "acts" and "actions," however, in a way that underscores our statutory reading. Actions, he writes, "necessarily manifest themselves in *bodily movement* ...." *Id.* at 172 (emphasis added). Acts, he proposes by contrast, should be more broadly viewed as *conduct* that "may be positive [*i.e.*, actions] or negative [*i.e.*, omissions]." *Id.* at 173. Kleinig concludes of omissions, "Though their lack of reference to bodily movement of a reasonably determinate kind renders it inappropriate to speak of omissions as actions, it does not gainsay their act or conduct status." *Id.* at 174.

Though we recognize the utility of Kleinig's classification of omissions as conduct for attributive purposes, this does not alter our decision. Defendant's refusal to decode may surely be regarded as conduct. It may even be recognized as conduct to which blame can reasonably attach. The criminal code, however, does not equate "act" with "conduct," as Kleinig would do. Rather, it defines "act"—as Kleinig defines "action"—as "bodily movement." This definition, as we have indicated, is contradistinctive to the definition of "omission." Thus, defendant's refusal was not an act within the meaning of the criminal code.

6. For example, A.R.S. § 13–2310(A) provides: "Any person who, pursuant to a scheme or artifice to defraud, knowingly obtains any benefit by means of false or fraudulent pretenses, representations, promises or material *omissions* is guilty of a class 2 felony." (Emphasis added.)

employers have deterrent powers as potent as termination and demotion. And we do not believe the legislature intended by the passage of A.R.S. § 13–1602 to march the criminal law into the workplace to bolster employers' directives with the punitive machinery of the state.

The criminal damage statute outlaws acts of reckless tampering or interference with the property of another. Defendant committed no such act. Though his behavior was probably spiteful, "relatively few forms of spiteful conduct are actionable in ... crime." *Mahru v. Superior Court,* 191 Cal.App.3d 545, 549, 237 Cal.Rptr. 298, 300 (1987). Defendant caused ITT to undergo decoding costs he could have averted had he chosen to leave on more accommo-

dating terms; yet he neither harmed ITT's equipment nor damaged its programs. His encoding was not criminal damage because it was permitted. His refusal to decode was not criminal damage because it was an omission, not an act.

The judgment of conviction is reversed, and the trial court is directed upon remand to enter a verdict of acquittal.

KLEINSCHMIDT, P.J., and GRANT, C.J., concur.